## BARRY *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 170.   Argued March 6, 1913.—Decided May 26, 1913.

Where a contractor is unable to make deliveries under a contract with the Government for continuous deliveries of a specified article and agrees with the properly authorized official to meet the emergency by delivering goods of a different class to be paid for according to actual value, the delivery is not one under the contract but is an emergency purchase, nor is an acceptance by the Government an acceptance under the contract; if the goods so delivered are not of the value of the goods contracted for the Government may offset the difference against future deliveries under the contract.

The failure, by reason of a strike, of contractors to deliver coal as required by a contract for continuous delivery for the Philippine Division, creates a condition contemplated by the act of April 23, 1904, providing for open market emergency purchases, and a purchase of coal other than that contracted for so made from the contractor is an emergency purchase and not an outside purchase to meet contractor's default and accepted as fulfilment.

Where a contractor is indebted to the Government under one contract the Government may offset without separate action an amount owing by that contractor under another contract.

45 Ct. Cl. 532, affirmed.

THIS is a petition by appellants, partners under the style of Henry W. Peabody & Company, for a balance alleged to be due on account of coal furnished the Quartermaster's Department, Philippine Division of the Army. So much of the contract, which was in writing and duly signed and approved, as required by § 3744 of Revised Statutes, as is essential to a judgment, may be shortly stated: The contractors agreed to sell and deliver at Manila or certain other designated points, 70,000 tons of coal known as "Wallsend" coal, of good quality "for steaming purposes" at $5.15 per ton, deliveries not to exceed 800 tons per month. The contractors were required

to file an official report of tests showing the quality of coal intended to be delivered and a sufficient sample for test. The sixth provision of the contract was in these words:

"That the said parties of the second part shall file with the officer in charge of water transportation an official report of tests, showing the quality of the coal intended to be delivered and a sufficient sample for test, and if at any time the coal offered under this contract shall fall below the report so filed or the quality of the sample submitted, then such coal will be rejected."

By article 4 of the contract it was agreed, "that all deliveries on this contract shall be subject to careful inspection, under instructions of the Chief Quartermaster, Philippine Division, United States Army," etc. Payment for coal delivered under the contract was to be made on discharge of each cargo.

By article 12 it was agreed:

"That in case of failure of the said parties of the second part to comply with the stipulations of this contract according to the true intent and meaning thereof then the party of the first part shall have the power to purchase in open market at the lowest price obtainable, or by special contract, such quantity of coal of equal grade as may be required, not to exceed the amount herein stated, the difference in cost to be charged to and paid by the said parties of the second part, or their sureties."

The II, III and IV findings of fact are in these words:

## II.

"Deliveries were begun under this contract in August, 1904, and averaged about one delivery a month, and were made at the times and places and to the amounts requested by the officers of the Quartermaster's Department, who did not require or wish the full amount specified in the contract to be delivered and who also did not give and were not required to give the amount of notice specified

in paragraph 2 of the contract for deliveries at ports outside of Manila Bay.

"In the month of January, 1905, a strike took place at the Newcastle collieries in Australia, the source of supply of the coal known as Wallsend, specified in the contract, whereby the claimants became temporarily unable to supply that kind of coal. Being informed of this fact by cablegram dated January 21, 1905, and received at Manila on the same day, the agent of the claimants conveyed immediate notice thereof to Col. John L. Clem, Assistant Quartermaster General, United States Army, chief quartermaster of the Division of the Philippines at Manila, informing him at the same time that, as also stated in the same cablegram, an equal quantity of good Australian coal, known as mountain coal, could be supplied. It was stated in the conversation with Colonel Clem that this mountain coal was not fully equal to Wallsend, but that it was believed to be a good coal. Colonel Clem agreed to accept said mountain coal. It was then and there stated between said agent of the claimants and said Colonel Clem that the price to be paid for the 6,000 tons of mountain coal then required by the Government should be $5.15 a ton, the same price as specified in the contract for Wallsend coal, and agreed that the same should be considered as a purchase outside of the contract to meet existing conditions. The agent of the claimants thereupon cabled to their office at Sydney, New South Wales, Australia, ordering the 6,000 tons of mountain coal, and the same was delivered by the claimants, accepted by the Government, and paid for on a voucher of the disbursing quartermaster at Manila at the rate of $5.15 a ton.

### III.

"On the 3d of February, 1905, after the shipment, but before the delivery of said mountain coal, the claimants

addressed a letter to. Colonel Clem asking to be furnished with an order for said coal as a purchase in accordance with the agreement and conversation referred to in the preceding finding. Colonel Clem thereupon informed the claimants, through the officer in charge of water transportation, that a sample of the mountain coal would be shipped to the Quartermaster-General for test, and in case of its falling below the Wallsend coal, that difference would be charged against the claimants under the contract. The claimants, by letter of February 18, 1905, protested against this qualification, insisting that the agreement orally made with Colonel Clem was to accept mountain coal at the same price as that specified in the contract for Wallsend coal without reserve as to quality. The mountain coal was inferior to Wallsend coal, but its market value at Manila at that time, owing in part to said strike, was $5.15 a ton, the price orally agreed upon and paid to the claimants.

## IV.

A sample taken from the cargo of mountain coal above mentioned was sent to the Quartermaster-General at Washington, and on being subjected to test was found to be of less value than the Wallsend coal, as provided by the contract, the pro rata reduction in price of the cargo being found to be $3,193.32, or of the value of $4.63 a ton instead of $5.15.

"Thereafter claimant entered into a second contract with the chief quartermaster of the Division of the Philippines to deliver 60,000 tons of West Wallsend coal for the fiscal year beginning July 1, 1905. In the month of April, 1906, the quartermaster deducted from the price of a cargo of coal delivered under said contract the sum of $3,193.32 due the United States, the difference in value between the Wallsend coal as provided by the contract and the mountain coal delivered by the claimant."

*Mr. George A. King,* with whom *Mr. William B. King* was on the brief, for appellants.

*Mr. Frederick De C. Faust,* with whom *Mr. Assistant Attorney General John Q. Thompson* was on the brief, for the United States.

Mr. Justice Lurton, after making the foregoing statement, delivered the opinion of the court.

From the facts it is plain that the contractors could not and did not deliver a cargo of "Wallsend" coal in January, 1905, as their contract obligated them to do. This temporary inability was due to a strike at the colliery. This did not excuse them, since the contract did not so provide. The cargo of mountain coal which was bought to meet the immediate demand, though the same price was paid for it, had a fuel value of $3,193.32 less than that of the same quantity of Wallsend coal, as determined by tests and comparisons with the sample of Wallsend coal, and the question is whether this loss shall be borne by the Government or by the contractor.

Appellants say that if any cargo did not conform to the standard, the only right of the Government was to reject it. But it was not pretended that this cargo was Wallsend coal, or equal to that coal in quality, nor was it accepted as a delivery under the contract. That the Chief Quartermaster agreed to accept it and pay for it the price fixed for Wallsend coal under the contract, and did so accept and pay for it, constitutes the ground upon which the claim of appellants must rest.

The situation was one brought about by the inability of the contractors to carry out their contract. The coal was needed for present necessities. The deficiency in Wallsend coal had to be made up. There was thus presented one of the emergency conditions contemplated by

the law then in force, the act of April 23, 1904, 33 Stat.
268, 269 and the 548th and 549th paragraphs of the Army
Regulations of 1904, providing for "open market emer-
gency purchases." Under this condition and under this
authority, the Chief Quartermaster agreed to accept a
cargo of confessedly inferior coal, and pay the market
price for that quality of coal in Manila at the time. That
this cargo was not to be accepted as a fulfillment of the
contract, and as a waiver of any difference in value be-
tween that and Wallsend coal, is demonstrated by the
finding that it was agreed "that the same should be con-
sidered as a purchase outside of the contract to meet
existing conditions." It could not be regarded as an
"outside purchase" to meet conditions brought about by
the contractors' fault and at the same time be regarded as
accepted in fulfillment of the contract.

The finding that the Chief Quartermaster, after the
coal had been shipped, but before it arrived or was de-
livered, gave notice that he would send a sample of the
coal to the Quartermaster-General to be tested, and that
if it fell below the Wallsend coal, the difference would be
charged against the contractors, operated to put them
upon guard. They might have refused delivery. They
did not, although they protested and asserted views in
opposition to that of the officer. The payment made was
for that cargo as an "outside purchase," and not a pay-
ment under the contract for Wallsend coal. Neither is
the agreement to take that cargo, and the payment made
for it to be regarded as a waiver of any difference that
might exist between the quality and fuel value of the coal
so purchased and the coal which should have been sup-
plied. That it does not constitute a waiver, results from
the agreement that it should be considered "an outside
purchase," and the express notice before delivery that the
contractors would be charged with that difference. When
that difference was ascertained, it was charged up and

retained from money due under a later contract. The liability might have been asserted by the Government in an action; but it might, as it did, charge it up as a set-off against its own liability. It would be folly to require the Government to pay under the one contract what it must eventually recover for a breach of the other.

*Judgment affirmed.*